# IN THE SUPREME COURT OF IOWA

No. 11–0270

Filed June 7, 2013

**STATE OF IOWA,**

    Appellee,

vs.

**BRENT MICHAEL ROMER,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Adams County, David L. Christensen, Judge.

Defendant seeks further review of court of appeals decision which affirmed his convictions for sexual exploitation of a minor and sexual exploitation by a school employee. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Benjamin M. Parrott and Denise A. Timmins, Assistant Attorneys General, and Jeffrey B. Millhollin, County Attorney, for appellee.

**ZAGER, Justice**.

This case requires us to interpret the statutory language prohibiting sexual exploitation by a school employee under Iowa Code sections 709.15(3)(*a*) and (*b*). Romer appeals his conviction on five counts of sexual exploitation of a minor and three counts of sexual exploitation by a school employee. Romer argues he did not violate Iowa Code section 709.15(3) because, though he was a teacher and the minors were students, no direct teacher–student relationship existed. He further argues he could not have violated Iowa Code section 709.15(3), as delineated in counts VII and VIII, because the State did not produce evidence that he physically touched the students identified in those two counts. Finally, he argues the district court abused its discretion in not severing the eight counts of the trial information into five different trials. The court of appeals rejected these arguments and affirmed his convictions. We granted further review. Upon our review, we affirm the decision of the court of appeals and the judgment of the district court.

## I.  Factual Background and Procedural History.

Viewing the trial evidence in the light most favorable to the jury's guilty verdicts, the jury could have found the following facts. Brent Michael Romer was a licensed teacher in the state of Iowa. He taught elementary school for Cumberland and Massena Community Schools, beginning as a substitute teacher in October 2000. He was subsequently hired as a full-time teacher, which employment continued from June 2004 through July 2008. He also taught as a substitute teacher in the Corning Community School District prior to his full-time position with Cumberland and Massena. Romer lived in nearby Corning. Romer was charged with five counts of sexual exploitation of a minor in violation of Iowa Code section 728.12(1) and three counts of sexual exploitation by a

school employee in violation of Iowa Code sections 709.15(3)(*a*) and (*b*), and 709.15(5)(*a*). These charges stem from three separate and distinct events. All of the charges involved students who attended school in the Corning Community School District. None of the students involved with Romer were in an existing teacher–student relationship at the time that any of the events charged in the trial information occurred.

The first event involved an admitted sexual relationship with R.A. R.A. initially met Romer when Romer was a substitute teacher for her elementary school class. Romer reinitiated contact with R.A. in 2005 when she was fifteen years old. This contact was initiated through the social networking website MySpace. Shortly after R.A. turned sixteen, a sexual relationship commenced. This sexual relationship lasted until R.A. was eighteen, at which time she broke off the relationship. R.A. and Romer engaged in sexual contact and sexual intercourse multiple times during this relationship.

The second event occurred in November 2007. Fifteen-year-old L.A. was babysitting at Romer's house, and fourteen-year-old K.G. visited L.A. while she was babysitting. As in the case of R.A., K.G. first met Romer when he was her substitute teacher in her elementary school class. During this visit, L.A. exchanged text messages with Romer. In these text messages, Romer stated there was a camera available and suggested the two girls take nude photographs of each other. While the girls took some photographs of themselves, there is no evidence that these photographs were inappropriate. However, when Romer returned home, he began taking photographs of both of the girls in various sexual poses he suggested. These photographs depict L.A. nude from the waist up and K.G. touching L.A.'s breasts with her hands and mouth.

The third event occurred on July 4, 2008. N.S., a fifteen-year-old female, and L.A. attended a party at Romer's house where alcohol was being consumed. Z.G., a seventeen-year-old male, also attended. The three minors became intoxicated at the party, and Romer took pictures of them in various sexually explicit poses. The pictures depict the female minors kissing, taking off their clothing, and embracing. Most of the pictures show L.A. and N.S. naked from the waist up and wearing only their underwear. One of the pictures shows Z.G. touching L.A.'s genital area. Another adult male is also visible in some of the pictures and in one photograph is seen touching N.S.'s breast.

After R.A.'s mother discovered the sexual relationship between R.A. and Romer, she reported the sexual relationship to Romer's school officials. Romer resigned his teaching position with the Cumberland and Massena Community Schools on June 17, 2008, which resignation was accepted by the school board on July 21, 2008. In November 2009, R.A. reported her relationship with Romer to the police, and an investigation commenced. In March 2010, the State charged Romer with five counts of sexual exploitation of a minor and three counts of sexual exploitation by a school employee.

On April 14, 2010, Romer filed a motion to bifurcate the multiple offenses into separate trials. After a hearing, the district court overruled the motion on the basis that the alleged acts, if proven, were part of a common scheme or plan and should therefore be tried together. Romer renewed his objection to a joint trial of the multiple offenses shortly before trial in his third motion in limine. The district court denied this motion in limine.

On November 4, 2010, Romer also filed a motion to adjudicate law points, arguing that the charges of sexual exploitation by a school

employee mischaracterized the intent of Iowa Code section 709.15 because Romer did not have a direct teacher–student relationship with the students he was charged with exploiting. The district court denied the motion, finding a direct teacher–student relationship was not required. Romer renewed his objection shortly before trial by filing a motion in limine. The district court denied this motion as well.

Jury trial commenced on December 14, 2010. At the close of all of the evidence, Romer moved for a directed verdict on counts VII and VIII of the amended trial information involving K.G. and L.A. Specifically, Romer argued the State had not met its burden with respect to proving that Romer had "engaged in any sort of sexual conduct or any prohibited sexual conduct" with either K.G. or L.A. to support the offense of sexual exploitation by a school employee. The district court denied this motion. The jury returned its verdicts of guilty to all eight counts of the amended trial information on December 17, 2010. Romer appealed, arguing the district court committed reversible error in three ways: (1) in its rulings on the applicability of sexual exploitation by a school employee, (2) in its ruling that Romer's actions in directing students to pose in sexually explicit positions constituted sexual exploitation, and (3) in its refusal to sever the various counts of the trial information.

We transferred the case to the court of appeals which affirmed the rulings of the district court and the convictions. We granted Romer's application for further review.

**II. Standard of Review.**

To the extent Romer's appeal involves questions of statutory interpretation, we review for correction of errors of law. *In re Det. of Johnson*, 805 N.W.2d 750, 753 (Iowa 2011). Romer also claims the State

did not produce sufficient evidence to convict him of several of the counts for which he was convicted.

> Sufficiency of evidence claims are reviewed for a correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it.

*State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citations and internal quotation marks omitted).

Finally, we review a district court's "refusal to sever multiple charges against a single defendant for abuse of discretion." *State v. Elston*, 735 N.W.2d 196, 198 (Iowa 2007).

### III. Discussion and Analysis.

Romer appeals on three issues. First, he argues he cannot be convicted of a violation of Iowa Code section 709.15(3), prohibiting sexual exploitation by a school employee, because there was not an existing teacher–student relationship between him and any of the minors whom he was convicted of exploiting. Second, he argues he cannot be convicted of sexual exploitation because the behavior he engaged in did not constitute sexual conduct with two of the minors, as defined in sections 709.15(3)(*b*) or 702.17.[1] Finally, Romer argues his charges

---

[1]This section provides:

> The term "*sex act*" or "*sexual activity*" means any sexual contact between two or more persons by: penetration of the penis into the vagina or anus; contact between the mouth and genitalia or by contact between the genitalia of one person and the genitalia or anus of another person; contact between the finger or hand of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152; or by use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

Iowa Code § 702.17 (2009).

should have been severed into multiple trials, and the district court's refusal to do so resulted in unfair prejudice. We address each of these issues in turn.

**A. Teacher–Student Relationship**. Romer argues he cannot be convicted of a violation of Iowa Code section 709.15(3), prohibiting sexual exploitation by a school employee, because there was not a contemporaneous teacher–student relationship between him and any of the minors whom he was convicted of exploiting. Section 709.15(3) provides:

> 3. Sexual exploitation by a school employee occurs when any of the following are found:
>
> *a.* A pattern or practice or scheme of conduct to engage in any of the conduct described in paragraph "*b*".
>
> *b.* Any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student. Sexual conduct includes but is not limited to the following: kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act as defined in section 702.17.
>
> Sexual exploitation by a school employee does not include touching that is necessary in the performance of the school employee's duties while acting within the scope of employment.

Iowa Code § 709.15(3) (2009).[2]

> The district court found that
>
> there is no requirement in Iowa Code section 709.15(3)(*b*) that the minor be a student of the teacher during the time frame they were allegedly being exploited. By omitting specific language to require a direct teacher–student relationship, the legislature clearly did not intend to limit exploitation of minor students to occur only when the

---

[2]The charged acts occurred between January 2005 and July 2008. Unless otherwise indicated, all references are to the 2009 Code, which included legislation enacted on or before July 1, 2008.

teacher is in the student's school or was in fact the student's teacher.[3]

A jury convicted Romer of violating Iowa Code section 709.15(3)(*a*), finding that Romer had engaged in sexual exploitation by a school employee because he had engaged in "[a] pattern or practice or scheme of conduct to engage in any of the conduct found in paragraph '*b*'." *Id.* § 709.15(3). The State does not dispute that at the time of the events giving rise to these convictions, no current teacher–student relationship existed between Romer and any of the involved students.[4]

We apply our time-honored principles of statutory construction in order to determine whether the district court made errors of law.

> The purpose of statutory interpretation is to determine the legislature's intent. We give words their ordinary and common meaning by considering the context within which they are used, absent a statutory definition or an established meaning in the law. We also consider the legislative history of a statute, including prior enactments, when ascertaining legislative intent. When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases. We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction.

*In re Estate of Buckwoldt*, 814 N.W.2d 215, 223 (Iowa 2012) (citations and internal quotation marks omitted). However, "we strictly construe criminal statutes and resolve doubts in favor of the accused." *State v. Adams*, 810 N.W.2d 365, 369 (Iowa 2012) (citation and internal quotation marks omitted).

---

[3]Iowa Code section 709.15(2) governs sexual exploitation of a counselor or therapist and prohibits "[a]ny sexual conduct with a patient or client or former patient or client within one year of the termination of the provision of mental health services by the counselor or therapist . . . ." The legislature did not include corresponding limiting language in Iowa Code section 709.15(3). *Compare* Iowa Code § 709.15(2)(*c*), *with id.* § 709.15(3)(*b*).

[4]Romer had been a substitute teacher for two of the students when they had been in elementary school, but the events giving rise to his convictions did not occur when they were his students.

The legislature defined "student" as

> a person who is currently enrolled in or attending a public or nonpublic elementary or secondary school, or who was a student enrolled in or who attended a public or nonpublic elementary or secondary school within thirty days of any violation of subsection 3.

Iowa Code § 709.15(1)(*g*). It defined "school employee" as "a practitioner as defined in section 272.17." *Id.* § 709.15(1)(*f*). This section defines "practitioner" as "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." *Id.* § 272.1(7).

We have not yet analyzed whether the legislature intended for a teacher–student relationship to concurrently exist before a teacher could be found guilty under Iowa Code section 709.15(3). Romer concedes that, under the plain language of the statute, he was a school employee and the minors involved were students. His contention is that he did not have a "fiduciary relationship" with the students, as he was not *their* teacher at the time of the incidents and, thus, "did not create a coercive and unequal balance of power over the students that forced them to engage in sexual conduct with him." He argues that the legislature did not intend for the conduct in which he engaged to be subject to Iowa Code section 709.15(3).

Romer argues that *Stotts v. Eveleth*, 688 N.W.2d 803 (Iowa 2004), should control this question. In *Stotts*, an eighteen-year-old student engaged in a consensual sexual relationship with a teacher. *Id.* at 806. We evaluated whether a teacher–student relationship was required to determine if Stotts was entitled to monetary damages for the teacher's conduct in initiating the sexual relationship. *Id.* at 807. We defined a

"fiduciary relationship" as "one in which a person is under a duty to act for the benefit of another as to matters within the scope of the relationship." *Id.* at 811 (citing *Mendenhall v. Judy,* 671 N.W.2d 452, 455 (Iowa 2003)). We determined that no fiduciary relationship existed between the "two consenting adults." *Id.*

*Stotts*, however, does not control. It deals with a different issue than the one presented here. *Stotts* involved civil litigation and is not analogous to Romer's criminal conduct. In *Stotts,* the plaintiff was attempting to find a cause of action for which she could recover damages in a situation where no existing law provided a specific cause of action. *Id.* at 812. Finally, the events giving rise to Stotts's lawsuit predate Iowa Code section 709.15(3), and consequently, our court did not construe that Code section. Thus, it is not persuasive in determining the intent of the legislature in enacting Iowa Code section 709.15(3).

1. *Legislative intent to criminalize relationships broader than just teacher–student relationships.* "School employee" includes professionals who are not teachers. In drafting the statute, the legislature defined "school employee" much more broadly than Romer acknowledges. The legislature did not intend to criminalize actions only by teachers, but by the much broader category of "school employee," which it defines as "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." Iowa Code § 272.1(7). Thus, the legislature included professionals, such as administrators and teachers, as well as individuals who are certified, such as para-educators. *See id.* § 272.1(6) (defining "para-educator" as "a person who is certified to assist a teacher in the performance of instructional tasks . . . ."). These individuals may never have a direct teacher–student

relationship. Thus, it would be an illogical interpretation to conclude the legislature intended to require an existing teacher–student relationship in order for a school employee to violate this Code section. *See Andover Volunteer Fire Dep't v. Grinnell Mut. Reins. Co.*, 787 N.W.2d 75, 86 (Iowa 2010) (stating that when interpreting statutes, we "avoid creating impractical or absurd results.").

2. *Legislative intent to criminalize power relationships.* "When we interpret a statute, we assess the statute in its entirety, not just isolated words or phrases." *Buckwoldt*, 814 N.W.2d at 223. Iowa Code section 709.15(2) criminalizes sexual exploitation by a counselor or therapist. In interpreting this Code section, we have emphasized that it is exploitation of the power relationship that must be avoided. *State v. Allen*, 565 N.W.2d 333, 337 n.2 (Iowa 1997) ("Our cases have emphasized that persons acting in professional roles have a disproportionate influence on those they serve, and thus have a responsibility to scrupulously observe the bounds of propriety." (Citations and internal quotation marks omitted.)).

Iowa Code section 709.15(2)(*b*) criminalizes sexual conduct with an "emotionally dependent" patient or client, emphasizing the legislature's intent to protect those who might potentially be exploited through that power relationship. Iowa Code section 709.15(2)(*c*) also limits the time a counselor or therapist can be charged with exploiting a former patient or client to one year, again emphasizing that it is the power relationship and not the mere status of a counselor or therapist that the legislature intended to regulate. Iowa Code section 709.15(3) has no analogous limitations requiring emotional dependency or a time limitation.[5] Iowa

---

[5]Though there is no specifically analogous time limitation governing the relationship between the school employee and the student, we note that the legislature

Code § 709.15(3). When the legislature added subsection (3), it copied much of the language it used in subsection (2). *Compare* Iowa Code § 709.15(2), *with id.* § 709.15(3).[6] If the legislature had intended for a student to be emotionally dependent, or to be in a direct and current teacher–student relationship in order for the teacher to be convicted of violating section 709.15(3), the legislature could have made it a part of the statute. Based on our directive to interpret a statute in context, we find the lack of inclusion of a requirement that a teacher–student relationship exists to be instructive. The legislature did not explicitly require emotional dependency, or a direct or current teacher–student relationship to exist prior to making the school employee subject to the statutory prohibition. It is the fact that Romer was a teacher and the victims were students, as defined under the Code, which makes the conduct a crime.

---

did include time limitations in another part of the statute. The word "student" is defined as

> a person who is currently enrolled in or attending a public or nonpublic elementary or secondary school, or who was a student enrolled in or who attended a public or nonpublic elementary or secondary school within thirty days of any violation of subsection 3.

Iowa Code § 709.15(1)(*g*). This provides further evidence the legislature considered the issue of timing and declined to otherwise limit the relationship parameters. This leads us to conclude the legislature was not attempting to limit the relationship covered by the statute.

[6]The legislature, in fact, omitted the language requiring an emotionally dependent relationship. Iowa Code § 709.15(2)(*b*) says,

> Any sexual conduct, with an emotionally dependent patient or client or emotionally dependent former patient or client for the purpose of arousing or satisfying the sexual desires of the counselor or therapist or the emotionally dependent patient or client or emotionally dependent former patient or client . . . .

*Id.* § 709.15(2)(*b*). In contrast, Iowa Code section 709.15(3)(*b*) says, "Any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student." *Id.* § 709.15(3)(*b*).

We further find the legislature did not intend to restrict this prohibition to those in a specific past or present teacher–student relationship. We believe the legislature intended to protect students from being exploited by the teacher in the next classroom, the former middle school principal the student respected and admired, or the substitute teacher the student had in elementary school, for example.

We find no error of law by the district court in concluding that a contemporaneous teacher–student relationship was not required for Romer to be convicted of violating Iowa Code section 709.15(3).

**B. Requirement of Physical Contact to Constitute Sexual Conduct.** Whether physical contact is required in order to find the defendant engaged in "sexual conduct" under Iowa Code section 709.15(3) also presents an issue of first impression. Romer contends the State presented no evidence of sexual conduct with K.G. or L.A. This contention relates to his convictions on counts VII and VIII, in which he was charged with "engag[ing] in a pattern or practice or scheme of conduct involving sexual conduct with" K.G. in count VII and L.A. in count VIII.

In determining whether sufficient evidence existed to support a conviction for conduct involving K.G. and L.A., we review for correction of errors at law. *See Sanford*, 814 N.W.2d at 615 ("Sufficiency of evidence claims are reviewed for a correction of errors at law."). We consider all of the record evidence in the light most favorable to the State. *Id.* Similarly, in determining whether the legislature intended to criminalize the acts of which Romer is accused—directing students to assume sexualized poses and taking pictures of them for his own sexual gratification—we review for correction of errors at law. *See In re Det. of*

*Johnson,* 805 N.W.2d at 753 ("We review questions of statutory interpretation for correction of errors at law.").

Substantial evidence supports the conclusion that Romer took photographs of sexual conduct during the babysitting incident that occurred in November 2007 and involved K.G. and L.A. On appeal, Romer does not dispute that the State introduced sufficient evidence to find he photographed sexual conduct. The State also introduced sufficient evidence that Romer orchestrated the explicit photography session. Though Romer disputes that he directed this session, we have said, "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." *State v. Nitcher,* 720 N.W.2d 547, 556 (Iowa 2006) (citation and internal quotation marks omitted). "Evidence is considered substantial if, viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* We conclude the jury could have reasonably found not only that Romer both photographed the sexual conduct and orchestrated the poses, but that the photographs were clearly sexual in nature. We must then determine if Romer's conduct violated Iowa Code section 709.15(3).

The language of the statute prohibits "any sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student." Iowa Code § 709.15(3)(*b*). The statute then enumerates what the legislature defines as "sexual conduct." Specifically, it states " 'sexual conduct' includes, but is not limited to . . . kissing; touching of the clothed or unclothed inner thigh, breast, groin, buttock, anus, pubes, or genitals; or a sex act." *Id.* Both the November babysitting incident and the Fourth of July incident involved actions

between the minors that meet the statutory definition of sexual conduct. In order to convict Romer of violating Iowa Code section 709.15(3), the State must prove Romer engaged in sexual conduct with K.G. and L.A. *See id.* § 709.15(3).

Romer argues that sexual conduct requires some physical contact in order to meet the definition of the statute. The State urges us to find that the phrase "engaged in" sexual conduct does not require actual physical contact. *See id.* § 709.15(3)(*a*). We apply our principles of statutory construction in making a determination as to whether the State proved that Romer engaged in conduct in contravention of the statute. *See In re Estate of Bockwoldt*, 814 N.W.2d at 223 ("Because reasonable persons could disagree, the plain language of the statute is ambiguous, and we must turn to the principles of statutory construction."). "If the legislature has not defined words of a statute, we may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage." *Jack v. P & A Farms, Ltd.*, 822 N.W.2d 511, 516 (Iowa 2012) (citation and internal quotation marks omitted). The dictionary has multiple definitions for the word "engage." The one most applicable defines "engage" as "to employ or involve oneself." *Webster's Third New International Dictionary* 751 (unabr. ed. 2002). We conclude that Romer's conduct in orchestrating and photographing sexual conduct between minors, including K.G. and L.A., constituted sexual conduct as defined by Iowa Code section 709.15(3).

We note the plain words of the statute do not restrict sexual conduct to the actions listed in the statute. The statute prohibits "[*a*]*ny* sexual conduct with a student for the purpose of arousing or satisfying the sexual desires of the school employee or the student. Sexual conduct

*includes but is not limited to the following . . . ."* Iowa Code § 709.15(3) (emphasis added).

While we have not previously examined the definitional parameters of what constitutes sexual exploitation by a school employee, reference to our statute on sexual exploitation of a minor is instructive. Iowa Code section 728.12(1) (2009) provides:

> It shall be unlawful to employ, use, persuade, induce, entice, coerce, solicit, knowingly permit, or otherwise cause or attempt to cause a minor to engage in a prohibited sexual act or in the simulation of a prohibited sexual act. A person must know, or have reason to know, or intend that the act or simulated act may be photographed, filmed, or otherwise preserved in a negative, slide, book, magazine, computer, computer disk, or other print or visual medium, or be preserved in an electronic, magnetic, or optical storage system, or in any other type of storage system.

In 1978, the legislature enacted this statute prohibiting the sexual exploitation of a minor by causing the minor to engage in a prohibited sexual act intending that the act be photographed or filmed. 1978 Iowa Acts ch. 1188, § 1 (codified at Iowa Code § 728.12(1) (1979)).[7] The crime of sexual exploitation of a minor is aimed at the creation, dissemination, and possession of child pornography, rather than merely possessing obscene materials. *State v. Robinson*, 618 N.W.2d 306, 316 (Iowa 2000). We see no reason why the legislature would intend the definition of sexual exploitation under Iowa Code section 709.15(3)(*a*) or (*b*) be more restrictive than the general statute, or that it require an act of physical contact.

Indeed, we have interpreted the parallel restriction on a caretaker from engaging in sexual conduct with a dependent adult in a similar

---

[7]The crime of sexual exploitation of a minor has been expanded by the legislature on three separate occasions since then. However, none of the changes are applicable to this case.

manner. *See Smith v. Iowa Dep't of Human Servs.*, 755 N.W.2d 135, 138 (Iowa 2008). In *Smith*, we declared, "[T]here is no language in the statute [defining sexual conduct] that confines the phrase to require the caretaker to affirmatively touch the dependent adult in a sexual manner." *Id.* Though the situation here is not quite analogous—actual prohibited physical contact did occur between the caretaker and the dependent adult, with the dependent adult initiating it—*Smith* confirms that we have previously construed the identical statutory language more broadly than Romer now urges.

> "[S]exual conduct" has a much broader meaning under the statute and requires the actions of the caretaker to be examined in light of all of the circumstances to determine if the conduct at issue was sexual and done for the purpose of arousing or satisfying the sexual desires of the caretaker or the dependent adult.

*Id.*

Further, we find the language the legislature chose to be compelling. The legislature specifically stated that "sexual conduct" was "not limited" to the list that it gave. Iowa Code § 709.15(3)(*b*). Romer argues that because all of the items in the list following that language included physical contact, the legislature only intended to include physical contact. *See id.* We do not find this reasoning persuasive. We conclude the legislature's clear intent was to protect students from exploitation by school employees. Further, we recognize the legislature was acknowledging the limits of its own ability to identify ways in which school employees could potentially exploit students. Here, there can be little doubt that Romer persuaded and induced K.G. and L.A. to engage in prohibited sexual conduct, and he photographed the conduct. Romer engaged in interactive conduct with the students, and the students engaged in sexual conduct based on his instructions.

The district court was correct in concluding that the statute defining "sexual conduct" does not require physical contact between the school employee and the student to support a conviction for sexual exploitation by a school employee. Thus, we find no error at law by the district court in its ruling on this issue.

**C. Severance of the Counts.** Romer argues the district court abused its discretion in refusing to sever the eight counts against him into five separate trials. We review a district court's "refusal to sever multiple charges against a single defendant for abuse of discretion." *Elston*, 735 N.W.2d at 198. "To prove the district court abused its discretion in refusing to sever charges, [the defendant] bears the burden of showing prejudice resulting from joinder outweighed the State's interest in judicial economy." *Id.* at 199.

*Elston* provides the framework by which we interpret whether the district court was required to sever counts. Just as in *Elston*, we begin our analysis with Iowa Rule of Criminal Procedure 2.6(1), which provides:

> "Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless, for good cause shown, the trial court in its discretion determines otherwise."

*Id.* at 198 (quoting Iowa R. Crim. P. 2.6(1)).

> Further, we explained in *Elston*:

> We have held that transactions or occurrences are part of a common scheme or plan under Iowa Rule of Criminal Procedure 2.6(1) when they are the products of a single or continuing motive. In ascertaining whether a common scheme or plan exists, we have found it helpful to consider factors such as intent, modus operandi, and the temporal and geographic proximity of the crimes.

*Id.* at 198–99 (citations and internal quotation marks omitted).

1. *Common scheme or plan.* We interpreted the phrase "common scheme or plan," as used in the Iowa Rule of Criminal Procedure 2.6(1), in *State v. Lam,* 391 N.W.2d 245, 249 (Iowa 1986). "A 'common scheme or plan' by its very definition presupposes that it involves a series of separate transactions or acts." *Id.* In *Lam,* we adopted the Missouri test in finding "the essential test in determining whether a common scheme or plan exists is the requirement that all offenses charged must be products of a single or continuing motive." *Id.* at 250. We cited Missouri cases, including *State v. Burroughs,* 673 S.W.2d 474 (Mo. Ct. App. 1984). *Id.* In *Burroughs,* the Missouri court convicted the defendant of rape, sodomy, incest, and promoting prostitution. 673 S.W.2d at 475. The Missouri Court of Appeals concluded that "[t]he defendant was involved in a common scheme and plan to pervert his children's morals, and to use them for his own enjoyment and profit." *Id.* at 476.

Thus, in *Lam,* we found that the two offenses with which Lam was charged—two otherwise unrelated burglaries—"were parts of a common scheme or plan to burglarize apartments during normal working hours. It is readily inferable that both offenses were products of a single and continuing motive for obtaining small portable objects from apartments for money." *Id.* Evidence of one burglary was not needed to prove any of the elements of the other burglary, yet we found that trying them together was appropriate. *Id.*

Similarly, in *Elston,* we found that joinder of the charges was proper. 735 N.W.2d at 200. "All of the crimes alleged in this case against Elston could be found to have been motivated by his desire to satisfy sexual desires through the victimization of children." *Id.* We also found that the transactions "occurred in close geographic proximity." *Id.*

Though we found that there was no temporal proximity and the modus operandi was dissimilar, we nonetheless found a "common scheme or plan" existed. *Id.*

Here, the jury convicted Romer on all eight counts with which he was charged. The verdict form provided the jury with three options regarding counts VI, VII, and VIII. Specifically, on these three counts, the jury could find Romer "not guilty," "guilty of sexual exploitation by a school employee by pattern, practice, or scheme of conduct," or "guilty of sexual exploitation by a school employee." Significantly, on all three of these counts, the jury found Romer "guilty of sexual exploitation by a school employee by pattern, practice, or scheme of conduct." The jury, which heard all of the evidence, found that these three counts, which involved all three of the events that generated the criminal activity for which Romer was convicted, were each part of a "pattern, practice, or scheme of conduct." We show great respect for a jury's fact-finding function. *See, e.g.*, *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (finding that it is the jury's role to be the primary trier of facts).

Romer bases much of his argument on the contention that not all of the evidence was required in order to convict Romer on each individual count. This fact, even if true, is not material. In *Lam*, we noted that the amended rule authorizing joinder of offenses in a single information where the offenses charged are based either on "the same transaction or occurrence" or "a common scheme or plan" was specifically intended to achieve judicial economy through "liberaliz[ing] and broaden[ing] charging practices so as to allow prosecutors more leeway in seeking to join multiple offenses for a single prosecution." *Lam*, 391 N.W.2d at 249. Even if some of the evidence needed to prove count I was irrelevant to whether Romer committed the acts he was charged with in count IV, for

example, the State had the right to charge multiple counts in the same offense to achieve judicial economy.

The jury concluded that each count Romer was convicted of constituted part of a "common scheme or plan," and that Romer's intent in that common scheme was to victimize children to fulfill his sexual desires. Two of the three events (and seven of the offenses charged) occurred at Romer's home. The other event—the long-term sexual relationship with R.A.—occurred occasionally at her home, at the rock quarry, or at numerous other locations in Iowa. This also establishes geographic proximity. Finally, Romer displayed a similar modus operandi with all of the minors involved. Romer maintained contact with victims in each of the three events through cell phone communication and texting. Romer requested the victims take nude or seminude photographs of themselves or allow him to take seminude photographs of them. Romer would choreograph or pose the minors in sexually explicit poses, and would encourage others to participate as well. Romer offered or provided alcohol to each of them, often resulting in intoxication. All of these factors support Romer having engaged in a common scheme or plan and that joinder of the counts was appropriate.

2. *Prejudice outweighing judicial economy.* "Although the existence of a "common scheme or plan' indicates the charges should be joined, the district court nonetheless had discretion to sever the charges for 'good cause.' " *Elston*, 735 N.W.2d at 199. Romer thus has the burden of showing prejudice in order to demonstrate the district court abused its discretion. *See Elston*, 735 N.W.2d at 199. ("To prove the district court abused its discretion in refusing to sever the charges, [the defendant] bears the burden of showing prejudice resulting from joinder outweighed the State's interest in judicial economy."). Romer argues that because

these charges were tried together, "the jury could not help but convict based upon propensity." The propensity to which Romer refers is based on our evidentiary rules. However, we have previously found that an attempt to equate our evidentiary rule's principles with rule 2.6(1)'s principles is inapposite.

> This evidentiary rule deals with what evidence is properly admissible to prove the crime charged. The joinder of offenses rule deals with the more basic question of what crimes can be charged and tried in a single proceeding. . . . The two rules deal with different questions, making the wholesale importation of the evidentiary rule into the law dealing with joinder of offenses inappropriate.

*Lam*, 391 N.W.2d at 249 (citations and internal quotations omitted).

Romer bears the burden of demonstrating that prejudice exists because of the joinder of offenses, and that this prejudice outweighs the State's interest in judicial economy. *See Elston*, 735 N.W.2d at 199. His only arguments in this area pertain to our evidentiary rule on propensity, which we have unequivocally established as distinct from an analysis under our law dealing with joinder of offenses. *See Lam*, 391 N.W.2d at 249. Here, in order to show a pattern, practice or scheme of conduct necessary to prove certain counts, it was necessary and relevant to show Romer's sexual motivation and criminal intent on other counts. The evidence is clearly relevant and legally intertwined. The district court also had a cautionary instruction which instructed the jury to look at each of the eight counts separately and reach a verdict on each count separately. Romer has not shown unfair prejudice by joining the interrelated eight counts into one trial.

Lastly, the State's interest in judicial economy outweighs the prejudice to Romer in allowing a single trial as stated earlier. Much of the same evidence was relevant and admissible on each of the various

counts. A single trial was in the interest of judicial economy as it was then unnecessary to require numerous witnesses to testify at multiple trials to the same operative facts. The district court did not abuse its discretion in balancing the prejudice to Romer and the judicial economy of a single trial.

## IV. Disposition.

We affirm the rulings of the district court on each of the three issues Romer raises. We conclude Romer was a school employee under the statute and the minors involved were students within the meaning of Iowa Code section 709.15(3). We further conclude that no contemporaneous teacher–student relationship was necessary to violate Iowa Code section 709.15(3). We find Romer's actions in orchestrating and photographing sexual conduct between minors was sufficient to satisfy the statutory definition for engaging in sexual conduct. Finally, we conclude that the events at issue here all fall within a common scheme or pattern, and thus, it was appropriate for the charges to be joined. The district court did not abuse its discretion in denying Romer's motion to sever as any prejudice to Romer was outweighed by the State's interest in judicial economy. Romer's convictions are affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Hecht and Appel, JJ., who concur in part and dissent in part.

**HECHT, Justice (concurring in part and dissenting in part).**

My colleagues conclude in the majority opinion that a school employee may be convicted under Iowa Code section 709.15(3) for conduct directed at a student enrolled in a school with which the defendant has no current employment relationship. As I do not believe the statute can properly be read so broadly, I respectfully dissent in part.

Suppose a twenty-three-year-old person employed as a school teacher in the State of California visited Iowa during the first week of June. During his week's vacation in Iowa, the teacher was observed kissing an eighteen-year-old girl who had graduated from an Iowa high school less than thirty days before the embrace. Assume this conduct offended the girl's parents, and the teacher is charged with sexual exploitation of a student. Under the majority's interpretation of the statute, the teacher could be convicted of the crime. The conviction would be affirmed under the majority's view because kissing is among the types of conduct prohibited by the statute. *See* Iowa Code § 709.15(3)(*b*) (2009) (defining sexual conduct to include kissing). The defendant in this hypothetical scenario would fall within the definition of "school employee" under section 709.15(1)(*f*) (including a teacher "who provides educational assistance to students," albeit in California, not Iowa). The recently-graduated girl would fall within the definition of "student" under section 709.15(1)(*g*) (including a student who attended a secondary school within thirty days of any violation). Indeed, under the majority's interpretation of the statute, a conviction of the teacher would apparently be sustained even if the girl did not know the defendant was employed as a teacher in California and the defendant did not know the girl was a recent high school graduate because the offense is based

entirely on the status of the teacher and the girl. Simply put, my colleagues in the majority view the crime of sexual exploitation under section 709.15(3) broadly, requiring no proof a school employee–student education-based relationship existed at the time of the exploitation.[8] For several reasons, I believe the legislature did not intend the statute to cut such a wide swath.

A statute is ambiguous if reasonable people could disagree as to its meaning. *IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001). "Even . . . a statute appear[ing] unambiguous on its . . . face can be rendered ambiguous by its interaction with and its relation to other statutes." 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 46.4, at 185 (7th ed. 2007). "Ambiguity may arise from specific language in a statute or when the provision at issue is considered in the context of the entire statute or related statutes." *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 425 (Iowa 2002); *accord State v. McCullah*, 787 N.W.2d 90, 94 (Iowa 2010) ("Ambiguity arises in two ways—either from the meaning of specific words or 'from the general scope and meaning of the statute when all of its provisions are examined.' " (quoting *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996)).

I believe reasonable people reading section 709.15(3) in context with the other parts of the statute and related statutes could disagree whether the general assembly intended a conviction of the crime of sexual exploitation by a school employee must be supported by proof that the defendant exploited an actual or perceived relationship of power, authority, or influence over a student enrolled in the school employing

---

[8]A school employee–student relationship extends under the statute for thirty days after a student was enrolled in or attended the school. Iowa Code § 709.15(1)(*g*).

the defendant. It is significant in my view that when the statute was enacted, *see* 2003 Iowa Acts ch. 180, § 65, the general assembly joined it in section 709.15 with a previously enacted prohibition of sexual exploitation by a mental health therapist or counselor, *see* 1991 Iowa Acts ch. 130, § 2 (codified as amended at Iowa Code § 709.15).

As the majority has correctly noted, the offense of sexual exploitation by a mental health provider enacted by the general assembly in 1991 requires proof of the exploitation of a relationship between an emotionally dependent patient or client (or former such patient or client) and a provider. Iowa Code § 709.15(2)(*b*)–(*c*). The evil targeted by those provisions of the statute is exploitation of relationships between professional providers of mental health services and their patients and former patients. The primary purpose of the statute is protection of patients who, because of their mental health and other circumstances, are especially vulnerable to sexual abuse perpetrated by mental health providers in whom they place immense trust and implicit confidence. The trust and confidence conferred by emotionally vulnerable patients to providers contributes substantially to an immense imbalance of power and control in the provider–patient relationship. It is the nature of the relationship between a provider and a patient that is essential to a positive therapeutic outcome and also to the commission of a criminal violation of section 709.15(2)(*b*) and (*c*). If the State fails to prove a professional relationship between the defendant–provider and his patient or client, or former patient or client, no criminal violation can result from the varieties of sexual conduct enumerated in section 709.15.

I of course concede the general assembly did not expressly prescribe that conviction of a school employee under section 709.15(3) requires proof of an education-based relationship between the defendant

and the student with whom the sexual conduct has occurred. Yet, a reasonable person could conclude from the context of the statute, as I do, that the general assembly intended the 2003 amendment of section 709.15 as a supplement to the list of relationships requiring protection from sexual exploitation. Students in elementary and secondary schools are especially vulnerable to sexual exploitation because of the actual or perceived power, influence, and control of school employees with whom they are regularly in contact. But for the education-based relationship—whether direct or indirect—between a school employee and a student within a school, the power imbalance favoring the school employee and enabling the exploitation does not exist. Put another way, any vulnerability of a student in one school to sexual conduct of an employee of another school does not arise from a relationship attended or enhanced by a power imbalance based on the school employee's status as a provider of "education assistance" to the student. *See* Iowa Code § 272.1(7) (supplying definition of "school employee" as a "practitioner" who "provides educational assistance to students"). In the absence of a school employee–student education-based relationship, any sexual misconduct perpetrated by a school employee is properly prosecuted under other criminal statutes,[9] but it is not in my view covered by section 709.15(3)(*b*).

My conclusion that the statute is ambiguous as to whether the general assembly intended in section 709.15(3) to criminalize only sexual conduct exploiting an education-based relationship is not based solely on the general assembly's placement of the criminal statute in a section targeting sexual exploitation of persons whose vulnerability is enhanced

---

[9]For example, Romer was convicted in this case of five counts of sexual exploitation of a minor under Iowa Code section 728.12(1).

by their relationships with other types of professionals. When the general assembly enacted section 709.15(3) it established a limitation period of ten years for the filing of an indictment or information for the offense. Iowa Code § 802.2A(2) (stating information or indictment for sexual exploitation by school employee must be found within ten years of date victim was enrolled in or attended "*the school*" (emphasis added)). The legislation also recognized a civil claim in favor of the sexually exploited student against the exploiting school employee, prescribing that it must be brought "within five years of the date the victim was last enrolled in or attended *the school.*" *Id.* § 614.1(12) (emphasis added). A reasonable person could view the general assembly's choice of "the" school instead of "a" school in these statutes of limitation as a further indication that the general assembly conceived the crime and the related tort of sexual exploitation by a school employee would be based on an employee's exploitation of a student enrolled in the school employing the defendant.

Having concluded section 709.15(3) is ambiguous when read in context and together with other related statutes, I would here apply the principle that provisions establishing the scope of criminal liability are to be strictly construed with doubts resolved therein in favor of the accused. *State v. Muhlenbruch*, 728 N.W.2d 212, 216 (Iowa 2007). I acknowledge that we decline invitations to narrow a broad legislative formulation by implying or constructing limitations not present in a statute when such narrowing would undercut the statute's obvious public purpose. *See State v. Hearn*, 797 N.W.2d 577, 583 (Iowa 2011); *State v. Hagedorn*, 679 N.W.2d 666, 669–70 (Iowa 2004); *State v. Nelson*, 178 N.W.2d 434, 437 (Iowa 1970) (stating criminal statutes " 'are not to be construed so strictly as to defeat the obvious intention of the

legislature.' " (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37, 42 (1820))); 3 Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 59:3, at 171 n.1 (7th ed. 2008) ("Although a penal statute must be strictly construed, that does not justify a court in supplying restrictive language that is not there."). I conclude, however, that these prudential maxims do not demand the interpretation of section 709.15(3) favored by the majority in this case because it is not obvious the general assembly's purpose was to enact a status crime in section 709.15(3) punishing a school employee for conduct directed at a person with whom the employee has no exploitable education-based relationship. It is instead obvious—at least to me—that the legislature intended to criminalize in section 709.15 the exploitation of only the enumerated special relationships in which the victims are especially vulnerable to abuse by professionals providing them with mental health services or education services. Sexual conduct not based on, and not exploitive of, those special relationships is criminal only if it is proscribed by other criminal statutes.

As I find the State offered no evidence that Romer had an education-based relationship with the persons he was charged with exploiting, I would resolve in Romer's favor my doubts about the applicability of section 709.15(3). Accordingly, I would reverse Romer's convictions under section 709.15(3). I concur, however, in the affirmance of Romer's convictions on the other charges.

Appel, J., joins this concurrence in part and dissent in part.